563 A.2d 593

CYTEMP SPECIALTY STEEL DIVISION, CYCLOPS CORPORATION, Hammermill Paper Company, a subsidiary of International Paper Company, PPG Industries, Inc., Sawhill Tubular Division, Cyclops Corporation and Wheatland Tube Company, Petitioners,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued March 7, 1989.

Decided Aug. 24, 1989.

Robert L. Kendall, Jr., Joan O. Brandeis, Schnader, Harrison, Segal & Lewis, Philadelphia, and Thomas E. Hirsch, III, Chadbourne & Parke, Washington, D.C., for petitioner.

Kenneth Zielonis, Norman James Kennard, Tucker Arensberg, P.C., Harrisburg, Craig Burgraff, Philip McClelland, Asst. Consumer Advocates, Harrisburg, for Industrial Gas Corp.

Charles R. Cornelius, Farrell, for Sharon Steel Corp.

Michael W. Gang, John H. Isom, Jesse A. Dillon, Morgan, Lewis & Bockius, Harrisburg, for National Fuel Gas Distribution Corp.

Lawrence F. Barth, Asst. Counsel, John F. Povilaits, Deputy Chief Counsel, Daniel P. Delaney, Chief Counsel, Veronica A. Smith, Deputy Chief Counsel, Harrisburg, for respondent.

Before CRUMLISH, Jr., President Judge, McGINLEY and NARICK, Senior Judge.

## OPINION

CRUMLISH, Jr., President Judge.

Cytemp Specialty Steel Division, Cyclops Corporation et al. (Cytemp) appeal that portion of a Pennsylvania Utility Commission (Commission) order upholding National Fuel Gas Distribution's (National Fuel) Rate Schedule BP proposed in Supplement No. 9 to Tariff Gas–Pa. PUC No. 7. National Fuel has subsequently filed Supplement No. 22 to

Tariff Gas–Pa. PUC No. 7 revising Rate Schedule BP and now moves to quash Cytemp's appeal as moot. We deny National Fuel's motion to quash and vacate and remand.

National Fuel provides gas sales and transportation service to industrial customers in northwestern Pennsylvania. Cytemp, lead petitioner in this litigation, is one of several customers in the large volume industrial service rate class (LVIS) who take only a portion of their annual gas requirements from National Fuel. These customers' remaining gas needs are supplied through "bypass" facilities that enable them to purchase additional gas volumes over privately owned pipelines from independent suppliers. However, as long as the bypass customers elect to remain connected to National Fuel's facilities, National Fuel must maintain standby facilities.[1]

In August 1987, National Fuel proposed that Rate Schedule BP go into effect, applicable only to the LVIS rate class customers equipped with bypass facilities. The new tariff provision was intended to recover the non-gas "fixed costs" for service to bypass customers who have the option to "swing-on" to National Fuel's services.[2] National Fuel identifies these fixed costs as return on plant, depreciation, operating and maintenance expenses, payroll, and taxes other than gross receipts tax.

In October 1987, the Commission suspended the tariff for a period of seven months pending investigations and subsequently consolidated the proceedings with National Fuel's

1. Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501 requires that "[e]very public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities.... Such service also shall be reasonably continuous and without unreasonable interruptions or delay."

2. National Fuel states that its traditional form of rate schedule was designed to recover substantially all of the non-gas fixed costs of service through annual commodity rates. Thus, National Fuel's gas rates developed on the assumption that customers will use its services throughout the year and that a year's consumption will allow that customer to pay a fair share of National Fuel's fixed costs. However, this approach does not recover a fair share of fixed costs from customers with bypass facilities because their use of National Fuel's facilities is sporadic, while fixed costs remain constant.

general rate application.[3] After extensive evidentiary hearings, Administrative Law Judge Robert A. Christianson recommended Rate Schedule BP's approval with certain modifications. The Commission's May 27, 1988 opinion and order rejected the suggested modifications and approved Rate Schedule BP as contributing "to the cost of maintaining the distribution system for those customers who choose to bypass the Company."[4] In a subsequent order, the Commission rejected Cytemp's reconsideration petition, concluding that Rate Schedule BP was "cost-justified".[5]

While Cytemp's appeal from the Commission's order was pending and prior to Rate Schedule BP's implementation, National Fuel filed Supplement No. 22, revising Rate Schedule BP. Although Cytemp filed a complaint with the Commission on November 14, 1988, challenging revised Rate Schedule BP, the Commission did not act within the sixty-day period. Thus, Supplement No. 22's modifications to Rate Schedule BP became effective December 30, 1988.[6]

## RATE SCHEDULE BP

For those LVIS customers with bypass facilities, Rate Schedule BP purports to recover on a monthly basis National Fuel's fixed costs by multiplying the *BP rate* by the *difference* between (a) the individual customer's BP level, and (b) the quantities of gas actually sold or transported by National Fuel to the bypass customers that particular month. The *BP level*, in turn, is determined by one of two methods. First, a bypass customer may nominate a monthly BP level of gas which it expects to purchase from National Fuel or transport over its system. Should the customer nominate an unrealistically low BP level and then

3. Supplement No. 10 to Gas–Pa. P.U.C. No. 7, Docket No. R–870719. Reproduced Record (R.R.), p. 29(a).

4. Opinion and order, Pennsylvania Public Utility Commission, May 27, 1988. R.R., p. 773(a).

5. Opinion and order, Pennsylvania Public Utility Commission, July 1, 1988 (denying Cytemp's petition for reconsideration). R.R., p. 795(a).

6. Section 1308(b) of the Code, 66 Pa.C.S. § 1308(b).

purchase or transport a greater volume during the peak billing months of December, January, February or March, the BP nomination is subject to a ratchet provision. This mechanism increases the nomination by the highest gas amount actually used during a peak winter month and remains in place for the next eleven months. Second, if a bypass customer does not nominate a BP quantity but does purchase *or* transport gas during one of the peak winter billing months, that gas quantity is deemed to be the customer's BP nomination for the next eleven months subject to the ratchet provision.

### REVISED RATE SCHEDULE BP

Supplement No. 22 makes certain modifications to Rate Schedule BP. Under original rate BP, a bypass customer was required to purchase or transport gas at a monthly "load factor"[7] ratio of 100%. Supplement No. 22 lowers the level of natural gas usage by approximately 25% which a bypass customer must maintain to avoid incurring BP charges. Thus, revised Rate Schedule BP assesses a monthly charge only if the BP level load factor falls below the LVIS rate class customer's composite load factor computed by National Fuel at 75.88%. Supplement 22, however, raised the BP *rate*.

### MOTION TO QUASH

█ Cytemp has challenged Rate Schedule BP as violating the Pennsylvania Utility Code's prohibition against unreasonable and unduly discriminatory rates.[8] National Fuel argues that Cytemp's appeal is moot because Supplement 22 modified original Rate Schedule BP as of December 30, 1988, thus precluding the assessment of any charges to a bypass customer pursuant to the Commission's May 27,

---

7. "Load factor" is the *ratio* between (a) the actual level of transportation and sales service provided by National Fuel to LVIS customers from December 1 to November 30, and (b) twelve times the highest combined level of transportation and sales service provided during any one of the four winter billing months.

8. Sections 1301, 1304 of the Code, 66 Pa.C.S. §§ 1301, 1304.

1988 order.[9] National Fuel now contends that these modifications "substantially" alter the nature of Rate Schedule BP, thereby eliminating any vestige of the tariff's alleged discriminatory or unreasonable aspects. Thus, appellate review on the merits of revised Rate Schedule BP must await the Commission's final order resolving Cytemp's pending complaint.

██ Unless an actual case or controversy exists at all stages of the judicial or administrative process, this Court will dismiss a case as moot. *Pennsylvania Liquor Control Board v. Dentici*, 117 Pa.Commonwealth Ct. 70, 542 A.2d 229 (1988). Although we generally will not decide moot cases, exceptions are made when (1) the conduct complained of is capable of repetition yet evading review, or (2) involves questions important to the public interest, or (3) will cause one party to suffer some detriment without the Court's decision. *Dentici; West Penn Power Co. v. Pennsylvania Public Utility Commission*, 104 Pa.Commonwealth Ct. 21, 521 A.2d 75 (1987).

In the present case, because Rate Schedule BP was approved on May 27, 1988, and amended December 30, 1988, it was operative for only one of the 1987–88 winter billing months. A bypass customer could be billed under original Rate Schedule BP only if subsequent months of transportation or sales service were less than December 1988 deliveries. Consequently, because Cytemp has not suffered actual economic loss as a result of the BP rate, its appeal of that rate schedule could be considered moot.

However, under original Rate Schedule BP, the narrow issue to be determined was the legality of a fixed-costs recovery method utilizing a particular BP level. While it is true that under Supplement 22 the tariff is now calculated

9. Under Rate Schedule BP, the amount that a bypass customer must pay over a twelve-month period is based upon the customer's peak monthly winter billing usage from December through March. Thus, when the Commission suspended Rate Schedule BP's effective date in October 1987 for a seven-month period, it denied the rate's implementation during the 1987–88 winter months. Therefore, Rate Schedule BP could not become effective prior to the 1988–89 winter.

on the difference between the actual gas volumes taken and 75% (rather than 100%) of the BP level, these modifications do not alter the nature of the BP rate schedule itself. Although revisions under Supplement 22 may make it easier to avoid paying a BP charge through reduction of the bypass customers' sales or transportation obligations, they leave intact Rate Schedule BP's standard scheme. Thus, the need to determine whether this method of fixed-costs. recovery is legal—regardless of the amount that may be recovered—still exists. We conclude, therefore, that this case is not moot.

Moreover, this issue should be decided, as it involves questions important to the public's economic interest. Future rate modifications could render the underlying issue capable of repetition yet evading review. *See Del–Aware Unlimited, Inc. v. Department of Environmental Resources,* 121 Pa.Commonwealth Ct. 582, 551 A.2d 1117 (1988).

## MERITS

 In considering Cytemp's challenge to the Commission's order approving Rate Schedule BP, our scope of review is limited to determining whether constitutional rights were violated, an error of law was committed, or the Commission's findings of fact or order were unsupported by substantial evidence. *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 113 Pa.Commonwealth Ct. 68, 536 A.2d 846 (1988). Although this Court affords considerable deference to the Commission's expertise in rate design, *U.S. Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa.Commonwealth Ct. 195, 390 A.2d 849 (1978), where the Commission fails to make findings of fact necessary for this Court to exercise its appellate review, a remand will be ordered. *Barasch v. Pennsylvania Public Utility Commission,* 107 Pa.Commonwealth Ct. 122, 527 A.2d 634 (1987).

 Both the Commission and intervenor National Fuel maintain that Rate Schedule BP is designed to recover the

fixed costs incurred by National Fuel in standing ready to serve the LVIS bypass customers. Cytemp, of course, is not challenging the right to recover these fixed costs [10] but only the reasonableness of the recovery method. Cytemp contends that National Fuel's existing sales and transportation rates, as well as its annual customer charge,[11] recover the full fixed costs of maintaining the system so that any revenues collected under Rate Schedule BP will result in an overcollection. Our review of the Commission's opinion, as well as its subsequent denial of Cytemp's petition for reconsideration, discloses that the Commission did not make findings necessary to this determination. Although we have thoroughly reviewed the Commission's hearing testimony, exhibits and raw data, including the fully allocated cost-of-service study for the future test year ending March 31, 1988,[12] there are no specific findings establishing that any revenues recovered under the BP Rate Schedule are directly related to the fixed costs of bypass facilities. Without findings as to the relationship between the annual gas load lost by National Fuel through its bypass customers [13]

10. 52 Pa.Code § 60.5 reads in part:
 Standby retail service shall entitle a transportation service customer to purchase natural gas at tariffed retail rates and shall be made available to a transportation service customer subject to the following conditions:
 (1) The transportation customer and the natural gas utility shall agree upon the maximum sales volumes that will be provided upon the request of the customer. Volumes taken in excess of this amount will require the payment of a penalty.
 (2) The rate charged for standby service shall recover natural gas supply fixed costs and any other costs, such as storage service costs where applicable, incurred to maintain natural gas supply for the transportation customer. Revenues for standby service shall be credited against natural gas costs in a proceeding under 66 Pa.C.S. § 1307 (relating to sliding scale of rates; adjustments).

11. All LVIS customers are assessed a monthly basic service charge through which some fixed costs are recovered. Paying the customer charge thus assures the LVIS bypass customer it will be able to swing-on to National Fuel's gas distribution system at any time.

12. National Fuel Gas Distribution Statement No. 107 (Testimony of Russell A. Feingold), R.R., p. 116(a), Exhibit No. 111.

13. Natural Fuel estimates that four of its large customers now use approximately 3.8 billion cubic feet of gas received through bypass

(which results in less fixed cost revenues) and Rate Schedule BP's ability to recover these fixed costs, we are unable to determine whether an overcollection of fixed cost revenues will occur.

National Fuel states that the purpose of the BP Rate Schedule is "to make sure that the customer pays for the level of demand that it places on National Fuel's system during the heating season." [14] However, the Commission has failed to make findings that Rate Schedule .BP is derived from "[a] fully allocated cost of service study which assigns to each customer class its proportionate share of the company's total cost of service." [15]

Accordingly, we remand for an identification of the non-gas fixed costs of service that are avoided due to customer installation of bypass facilities and a determination as to whether Rate Schedule BP fairly recovers these fixed costs. These findings are necessary so that a determination may be made whether Rate Schedule BP collects only the fixed costs that the LVIS customer would have paid if it had not installed bypass facilities.

## ORDER

The Pennsylvania Public Utility Commission order entered May 27, 1988, at R–870719 and R–870789, is vacated and this case is remanded to the Commission for additional findings of fact consistent with this opinion.

Jurisdiction relinquished.

facilities and that another 2.7 billion may be lost to "high risk" customers. National Fuel contends this combined volume is approximately one-half of the total throughput for rate making purposes in the LVIS rate class as established by the Commission's May 27, 1988 order. Opinion and order, May 27, 1988, R.R., pp. 9(a), 99(a), 100(a), 274(a).

14. Statement of National Fuel Gas Distribution Corporation filed in accordance with 52 Pa.Code § 53.52(a)(1), R.R., p. 151(a), Exhibit No. 31.

15. National Fuel Gas Distribution Statement No. 7 (Feingold testimony), R.R., p. 92(a).