Irwin A. POPOWSKY, Consumer
Advocate, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

PENNSYLVANIA CABLE TELEVISION
ASSOCIATION, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

MCI TELECOMMUNICATIONS
CORPORATION,
Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

CENTRAL ATLANTIC PAYPHONE
ASSOCIATION, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

AT & T COMMUNICATIONS
OF PENNSYLVANIA,
INC., Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

CITY OF PITTSBURGH, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 1995.
Decided Dec. 22, 1995.

**1030**

Philip F. McClelland and Joan Campion, for petitioner Popowsky, Consumer Advocate.

David M. Kleppinger, for petitioner Pa. Cable Television Assoc.

Joan Campion, for petitioner MCI Telecommunications Corp.

Alan Kohler, for respondent.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, KELLEY and NEWMAN, JJ.

PELLEGRINI, Judge.

Irwin A. Popowsky, the Consumer Advocate of Pennsylvania (Consumer Advocate), the Pennsylvania Cable Television Association (Cable Association), MCI Telecommunications Corporation, Inc. (MCI), Central Atlantic Payphone Association (Payphone Association), AT & T Communications of Pennsylvania, Inc. (AT & T), Digital Direct of Pittsburgh, Inc. (Digital Direct) and the City of Pittsburgh (Pittsburgh), collectively referred to as the Challengers, appeal a decision of the Pennsylvania Public Utility Commission (Commission) approving Bell Atlantic—Pennsylvania, Inc.'s (Bell), Petition and Plan for Alternative Form of Regulation (Petition and Plan) under Chapter 30 of the Public Utility Code (Code).[1]

## I.

To place in context the specific facts of this case and the plethora of contentions raised by the Challengers, it is necessary to explain Chapter 30's statutory framework for the alternative form of regulation for telecommunications services. Attempting to respond to the rapid changes taking place in telecommunications, as well as in the telecommunications industry, the General Assembly, in 1993, enacted Chapter 30 to "[m]aintain universal telecommunications service at affordable rates while encouraging the accelerated deployment of universally available, state-of-the-art, interactive, public-switched broadband telecommunications network in rural, suburban and urban areas." 66 Pa.C.S. § 3001(1). Recognizing, however, that implementation "at all costs" was not desirable, the General Assembly also adopted a legislative scheme in Chapter 30 that aimed at protecting the consumers of traditional telecommunications services. For this reason, Chapter 30 also seeks to:

(2) Ensure that customers pay only reasonable charges for local exchange telecommunications services which shall be available on a nondiscriminatory basis.

(3) Ensure that rates for noncompetitive telecommunication services do not subsidize the competitive ventures of providers of telecommunications services.

(4) Provide diversity in the supply of existing and future telecommunications services

---

1. 66 Pa.C.S. §§ 3001–3009.

and products in telecommunications markets throughout this Commonwealth by ensuring that rates, terms and conditions for noncompetitive services, including access services, are reasonable and do not impede the development of competition.

(5) Ensure the efficient delivery of technological advances and new services throughout this Commonwealth in order to improve the quality of life for all Pennsylvanians.

(6) Encourage the provision of telecommunications products and services that enhance the quality of life of people with disabilities.

(7) Promote and encourage the provision of competitive services by a variety of service providers on equal terms throughout all geographic areas in this Commonwealth.

(8) Encourage the competitive supply of any service in any region where there is a market demand.

(9) Encourage joint ventures between local exchange telecommunications companies and other entities where such joint ventures accelerate, improve or otherwise assist a local exchange telecommunications company in carrying out its network modernization implementation plan.

66 Pa.C.S. §§ 3001(2)–(9).

With the purposes of advancing state of the art telecommunications in all areas of the state and protecting traditional consumers of telecommunications in mind, Chapter 30 permits a local exchange telecommunications company (LEC) to file a petition requesting to be regulated under an alternative form of regulation. 66 Pa.C.S. § 3003(a). Chapter 30 defines an alternative form of regulation as being a "form of regulation of telecommunications services other than the traditional rate base/rate of return regulation, to be determined by the commission." 66 Pa.C.S. § 3002. The LEC must submit to the Commission a proposal regarding the method by which it is seeking to assess rates for its noncompetitive services and must provide the

Commission with data to support its proposal. *Id.*

The Commission, after providing notice and conducting a hearing, must review the LEC's petition and plan for alternative form of regulation. 66 Pa.C.S. § 3004(b). The Commission may approve the petition and plan, approve them with modifications, or deny them as not meeting the requirements of Chapter 30. *Id.* In so doing, the Commission must not only determine whether the rates for noncompetitive services proposed by the LEC in its petition and plan are just, reasonable, and not unduly discriminatory, but it must also determine that the plan does not unduly or unreasonably prejudice or disadvantage a customer class or providers of competitive services. 66 Pa.C.S. § 3004(d).[2]

When an LEC petitions for alternative regulation it is also required to show how it will bring its system up to a "state-of-the-art" status by submitting a network modernization implementation plan. Such a plan must commit to converting 100 percent of the LEC's interoffice and distribution telecommunications network to be broadband capability by December 31, 2015. The plan must also set forth the LEC's present and projected deployment of digital switches in its central offices, fiber optic trunk line capability between its central offices, as well as the intelligent network capability and integrated services digital network availability in its central offices. 66 Pa.C.S. § 3003(b)(1). Additionally, the LEC's network modernization plan must also reasonably balance the deployment of its broadband network between rural, urban and suburban areas, and shall deploy the broadband facilities in or adjacent to public rights-of-way abutting public schools, industrial parks and health care facilities. 66 Pa.C.S. §§ 3003(b)(2), (b)(3). The Commission must review the network modernization plan to ensure that it complies with the requirements of Chapter 30 and is in the public interest. 66 Pa.C.S. § 3004(c).

In conjunction with its petition for an alternative form of regulation, the LEC may also petition the Commission for a determi-

---

**2.** There are many other criteria that must be satisfied by the Petition and Plan. They will be discussed more fully later in this Opinion.

**1034**

nation of whether any of its telecommunication services or other service or business activity are competitive. 66 Pa.C.S. § 3005(a). The effect of such a petition, if granted, would result in the deregulation of the competitive service, including the deregulation of rates, tolls, charges, rate structures, rate base, rate of return, or earnings of the competitive service. 66 Pa.C.S. § 3004(d)(3).

With respect to the classification of competitive services, the Commission is required to establish regulations to prevent LECs from engaging in unfair competition and to require the LECs to provide nondiscriminatory access to their competitors. 66 Pa.C.S. § 3005(b). Moreover, when addressing the specific service at issue before it, the Commission must make numerous findings of fact concerning whether the service is, in fact, in a competitive market. 66 Pa.C.S. § 3005(a)(1). Additionally, the Commission must also ensure that there are competitive safeguards that prevent the LEC from discriminating against its competitors in the provision of the basic functions upon which the LEC's competitive services depend. 66 Pa.C.S. § 3005(e).

It is within this statutory framework that we must review the Commission's decision approving Bell's Petition and Plan. For purposes of organization and clarity, we shall first set forth the specific facts of the instant case. We will then address the parties' contentions as they pertain to the requirements for each portion of the Petition and Plan, as well as the necessary findings that must be made by the Commission with respect to each part of the plan.

## II.

On October 1, 1993, Bell filed its Petition and Plan with the Commission pursuant to Section 3003 of the Code.[3] The petition was organized into three parts as follows: a price stability mechanism for noncompetitive services, a competitive services deregulation

proposal, and a network modernization implementation plan. Bell's plan proposed that it would remain in effect through December 31, 2003.

After three administrative law judges (ALJs) were assigned to the proceedings on Bell's Petition and Plan, several evidentiary hearings were held, during which all of the parties presented the testimony of numerous witnesses.[4] Additionally, separate public input hearings were held in various locations throughout the Commonwealth, during which various customers and competitors of Bell's services expressed their opinions both supporting and opposing Bell's Petition and Plan.[5]

At the conclusion of the evidentiary and public input hearings, the ALJs issued a recommended decision denying Bell's Petition and Plan.[6] In so doing, the ALJs concluded that: (1) the price stability mechanism in Bell's plan did not ensure that the rates for its noncompetitive services were just, reasonable, and not unduly discriminatory; (2) Bell's network modernization plan did not meet the requirements of 66 Pa.C.S. § 3003(b) in that it was not sufficiently detailed and did not reasonably balance its broadband network between urban, suburban and rural areas; and (3) with the exception of the Billing Collection services, Bell's competitive deregulation proposal did not meet the requirements of 66 Pa.C.S. § 3005, because its proposed services did not satisfy the statutory definition of competitive services, and the proposal did not provide for competitive safeguards. Based upon these conclusions, the ALJs recommended that Bell's Petition and Plan should be rejected.

The parties filed extensive exceptions to the ALJs' recommended decision. Subsequently, a Bell representative sent a communication to the Commission that consisted of a draft speech delivered by the representative and written remarks summarizing a speech made on May 11, 1994, to an audience

---

3. 66 Pa.C.S. § 3003.

4. At the evidentiary hearings, the testimony of thirty-two witnesses was offered by the parties. The transcript from those hearings consists of 871 pages.

5. The transcript from the public input hearings totalled 1,339 pages.

6. The ALJ's recommended decision consists of 591 pages.

that included several Commissioners and members of the Commission staff.[7] The Commission, via a Secretarial letter, notified all of the parties of these communications, indicating that they may have been *ex parte*, and permitted each party to file responses or comments regarding the communications. Following the responses from the parties objecting to the communications as being *ex parte*, the Commission did not consider them or rely upon them in rendering its decision.[8]

Rejecting the ALJs' conclusion, the Commission approved Bell's Petition and Plan but with modifications. It included:

- a modification of Bell's proposed price stability mechanism so that it was based upon the Gross Domestic Product Price Index (Price Index) less an offset of 2.93 percent.
- a limitation on Bell's proposed exogenous[9] pass-through provision to mechanical regulatory events bearing only on Bell and that result from either jurisdictional shifts where costs are transferred to or from the interstate jurisdiction or limited regulatory accounting changes not initiated by Bell.
- a freeze on Bell's rates for protected services until December 31, 1999.
- a limitation on Bell's revenue neutral changes to those that occur only within each market basket,[10] and in the event that such a restriction is not feasible, allowing Bell to propose reductions in one market basket to be recovered from services included in another market basket.

7. In summary, the draft speech set forth several compromises that Bell would be willing to make to ensure the approval of its Petition and Plan. These compromises include:
 - Bell would not object to extending the freeze on the rates of its protected services from three to four years, or longer.
 - Bell would not object to an increase in the inflation offset value so long as it did not exceed 3.0 percent.
 - Bell would not accept an earnings sharing mechanism.
 - Bell would not accept any compromise in which its Directory Advertising service was not declared competitive by the Commission.

8. Additionally, four Pennsylvania Senators sent a signed letter to the Commission and the parties purporting to address several matters concerning the legislative intent behind Chapter 30 of the

As to Bell's request for deregulation of purportedly competitive services, the Commission declared that the services of Directory Advertising, Centrex, Paging, Repeat Call, Speed Call, and Billing and Collection were competitive.[11] However, because it concluded that Bell had not established the competitive safeguards required by Section 3005(b) of the Code, the Commission directed an investigative proceeding to be commenced to promulgate regulations concerning the competitive safeguards and directed Bell to provide it with informational tariff filings for all of the competitive services in the interim.

The Commission also approved Bell's network modernization plan subject to modifications, including:

(1) within ninety days, Bell must submit a three year implementation plan that sets forth, among other things, the location for upgrades in switches, the location for the placement of fiber access lines and other upgrades or expansions;

(2) Bell is to deploy a broadband telecommunications network within twenty percent of rural, suburban and urban areas by 1998, and a fifty percent deployment by 2004;

(3) Bell is required to classify its exchanges as urban, suburban, and rural based upon its Cell Density tariff requisites; and

(4) during its biennial updates to the Commission, Bell is to specify what efforts it has made with respect to joint ventures.

Code. Because the Senators were not participants or parties to the proceedings, the Commission refused to consider the letter.

9. Exogenous pass through events are extraordinary events beyond the control of the LEC that pose serious financial constraints upon the provision of noncompetitive services. The occurrence of such events would permit the Commission to make rate changes outside of the price stability mechanism.

10. The Commission delineated the separate market baskets as being residential local, business local, carrier switched access, and carrier special access.

11. See pages 26 and 27 of this Opinion for an explanation of each these services.

From this decision, the Challengers appeal to this Court.

### III.

As required by Section 3003(a) of the Code, 66 Pa.C.S. § 3003(a), an LEC seeking to be regulated under an alternative form of regulation must file a petition with the Commission requesting the alternative form of regulation. As defined by the Code, an alternative form of regulation is a "form of regulation ... *other than the traditional rate base/rate of return regulation,* to be determined by the commission. The term includes the use of any index, formula, rate stability plan, zone of rate freedom or streamlined form of rate regulation." 66 Pa. C.S. § 3002 (emphasis added).

After providing notice and hearing regarding the petition for alternative regulation, the Commission may approve the petition, approve it with modifications, or reject it entirely. 66 Pa.C.S. § 3004(b). The Commission is to determine that the rates proposed by the LEC are "just and reasonable rates in accordance with section 1301 (relating to rates to be just and reasonable,) [ [12] and] may authorize an [LEC] to set rates based on an alternative form of regulation pursuant to a plan approved by the Commission." 66 Pa.C.S. § 3004(a). In order for the Commission to approve the petition for alternative regulation, however, it must find that the petition satisfies the following criteria:

(1) Ensures the continued affordability of protected telephone service.

(2) Assures that the rates for noncompetitive services are just, reasonable and not unduly discriminatory through the use of a price stability mechanism or other alternative form which may include indices, formulas, rate stability plans, [etc.] Subject to commission approval, a price stability mechanism that allows total annual revenues from noncompetitive services to increase or decrease from the previous year's total revenues from noncompetitive services as a result of tariff rate changes

based upon the annual change in the Gross Domestic Product Price Index, as calculated by the United States Department of Commerce, minus 2.25% may meet the requirements of this section.

. . . . .

(4) Will not unduly or unreasonably prejudice or disadvantage a customer class or providers of competitive services.

. . . .

(14) Ensures that the economic risks associated with the provision of a competitive service by a local exchange telecommunications company or its affiliates shall not be borne by those customers who do not purchase such services.

66 Pa.C.S. 3004(d).[13]

Here, Bell proposed a price stability mechanism that would allow the revenues from non-competitive services to increase annually based upon the annual change in the Gross Domestic Price Index less 2.25 percent. Bell's proposed price stability mechanism was based upon its rates in effect on October 1, 1993. Bell further proposed that the prices on protected services such as residential and business local exchange and special access rates would remain frozen at their present rates at least until June 30, 1996.

### A.

▇ As previously indicated, Chapter 30 requires the Commission to find that the rates proposed under an alternative form of regulation be "just and reasonable." 66 Pa. C.S. § 3004. Generally, the requirement that rates be just and reasonable mandates that the proposed rates do not unreasonably benefit a utility's investors at the expense of the utility's ratepayers. *National Fuel & Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa.Cmwlth. 102, 464 A.2d 546 (1983). In the context of the traditional rate base/rate of return analysis, the courts of Pennsylvania have held that this requirement means that the challenged rates cannot produce revenues in excess of a

---

**12.** 66 Pa.C.S. § 1301.

**13.** Because Bell is requesting the alternative form of regulation, it bears the burden of proving

that its petition satisfies these criteria. 66 Pa. C.S. § 3004(e).

fair return on the fair value of the utility's property that is used for providing the service to the ratepayers. *Id.; see also Pennsylvania Petroleum Association v. Pennsylvania Power & Light Co.,* 488 Pa. 308, 412 A.2d 522 (1980). Chapter 30, however, specifically defines an alternative form of regulation as being some form of regulation other than the traditional rate base/rate of return analysis. 66 Pa.C.S. § 3002. The issue presented, therefore, is what method should be used in evaluating the justness and reasonableness of the proposed rates under an LEC's petition and plan.

In this regard, the ALJs, in their recommended decision, concluded that it was essential to examine Bell's existing rates in order to determine whether its proposed price stability mechanism was just and reasonable. The ALJs examined Bell's current rates and its earnings under the traditional rate base/rate of return analysis and determined that a reasonable return on equity of 10.4 percent was just and reasonable. The ALJs then concluded that Bell's twelve percent return on equity in 1992, which was earned under its existing rates, was not a just and reasonable return on equity.

■ The Commission, stating that there was a rebuttable presumption that existing Commission approved rates are just and reasonable,[14] nevertheless agreed with the ALJs' conclusion that it was necessary to review the rates on which Bell bases its price stability mechanism to determine if those rates are just and reasonable. The Commission, however, found that the ALJs' reliance solely upon the rate base/rate of return analysis in a Chapter 30 proceeding was in error. Instead, the Commission reasoned, the rate base/rate of return analysis is only one component in the determination of whether the

price stability mechanism would result in just and reasonable rates. The Commission found that other factors must also be taken into consideration. These factors include a comparison of Bell's rates with the national average which indicates that Bell's exchange rates are among the lowest in the nation and are among the lowest of the former Bell operating companies. Additionally, the Commission referred to the fact that Bell's actual earnings under the existing rates as evidenced by its quarterly earning reports filed with the Commission was twelve percent on common equity.[15] Citing to these factors, as well as the presumption arising from the previous approval of Bell's existing rates, the Commission concluded that Bell's existing rates were just and reasonable.

■ Before this Court, several of the Challengers contend that the Commission erred in its determination that Bell's existing rates were just and reasonable. Citing to the fact that Section 3004 of the Code specifies that the justness and reasonableness of the rates must be determined in accordance with Section 1301 of the Code, the Challengers refer this Court to numerous cases in which "just and reasonable" has acquired the technical meaning of a rate that will give the utility a fair rate of return. *See Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 496, 491 A.2d 94 (1985); *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* 522 Pa. 338, 561 A.2d 1224 (1989); *Pennsylvania Petroleum Association v. Pennsylvania Power & Light Co.,* 488 Pa. 308, 412 A.2d 522 (1980). The Challengers argue that, based upon these cases, the Commission was required to determine whether Bell was obtaining excess earnings under its existing rates. The Challengers argue that such a determination required the Commission to engage in the traditional rate base/

**14.** As the Commission noted in its decision, there is a strong presumption under the traditional rate base/rate of return analysis that Commission approved rates are just and reasonable. *See Schellhammer v. Pennsylvania Public Utility Commission,* 157 Pa.Cmwlth. 86, 629 A.2d 189 (1993). A party challenging the reasonableness of those rates bears the burden of proving that they are no longer reasonable. *Id.* Although an LEC bears the burden of proving that the rates proposed under its alternative form of regulation

will be just and reasonable, the presumption in favor of existing rates has not been disturbed by the provisions of Chapter 30.

**15.** The Commission pointed out that this percentage was less than the 15.15 percent on common equity that the Commission permitted Bell to earn when it set its rates in 1985. Additionally, the Commission noted that the quarterly earning reports included revenues that Bell had earned from its Directory Advertising service.

rate of return analysis, and that the Commission abused its discretion and committed an error of law when it failed to do so.

 While the rate base/rate of return analysis has traditionally been applied by the Commission in determining whether a utility's proposed rates are just and reasonable, it is within the Commission's discretion to determine whether it wishes to apply this analysis to determine the fair value of the utility's property. *See* 66 Pa.C.S. § 1311 (providing that the Commission "*may* ascertain and fix the fair value of . . . the property"); *see also Pittsburgh v. Pennsylvania Public Utility Commission,* 173 Pa.Superior Ct. 87, 95 A.2d 555 (1953). As stated by the Pennsylvania Supreme Court,

> the power to fix just and reasonable rates imports a flexibility in the exercise of a complicated regulatory function by a specialized decision-making body and that the term "just and reasonable" was not intended to confine the ambit of regulatory discretion to an absolute or mathematical formulation but rather to confer upon the regulatory body the power to make and apply policy concerning the appropriate balance between prices charged to utility customers and returns on capital to utility investors.

*Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.,* 492 Pa. 326, 337, 424 A.2d 1213, 1219 (1980), *cert. denied,* 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 97 (1981). It is within the Commission's discretion to strike a balance between the rates charged to the utility's customers and the returns conferred upon the utility's investors. Unless the Commission's decision does not bear a reasonable relationship to the regulatory objects sought to be obtained by the

legislation, the Commission's judgment must prevail. *Id.*

Here, Chapter 30 of the Code specifically defines an alternative form of regulation as being some form of regulation other than the traditional rate base/rate of return analysis. 66 Pa.C.S. § 3002. Given this definite language, and in light of the fact that there is substantial evidence to support the Commission's determination that other factors are indicative of Bell's earnings under its existing rates, we cannot say that the Commission's refusal to rely solely upon the rate base/rate of return analysis in examining Bell's existing rates does not bear a reasonable relationship to the purpose behind Chapter 30.[16]

## B.

Related to the requirement that the rates proposed under an LEC's alternative form of regulation be just and reasonable, Chapter 30 provides that the rates under the proposed plan may be established via a price stability mechanism or other alternative form, including indices, formulas, and rate stability plans. 66 Pa.C.S. § 3004(d)(2). Chapter 30 provides that, subject to Commission approval, an annual change in rates for noncompetitive services that is determined via the Gross Domestic Product Price Index less an offset of 2.25 percent [17] may be reasonable. *Id.*

In its Petition and Plan, Bell proposed an inflation offset and productivity differential of 2.25 percent. In proposing this percentage, Bell adduced evidence indicating that its prices grew approximately one percent more slowly than the inflation rate for the period between 1982 and 1992. Bell opined that it could have proposed a one percent offset and still given its customers the same rate of real

---

**16.** The Consumer Advocate also argues that the Commission erred in not considering its evidence regarding the reasonableness of Bell's future earnings under the price stability mechanism. Before the Commission, the Consumer Advocate offered four case scenarios outlining the earnings that Bell would acquire under its price stability mechanism. In three of those four scenarios, Bell would earn returns on equity greatly in excess of its costs of capital. Both the ALJs and the Commission rejected the Consumer Advocate's analysis on the grounds that it was too speculative. Additionally, the Commission ob-

served that, not only did this analysis attempt to apply a rate base/rate of return standard in examining Bell's future earnings, but that it was also flawed because it included earnings from Bell's directory advertising services. Consequently, the Commission did not err in refusing to consider this evidence.

**17.** This percentage, which is subtracted from the Gross Price Index in the price stability mechanism, reflects changes in the LEC's costs and productivity levels.

price reductions that they would have experienced under the traditional rate of return analysis. Bell indicated, however, that it proposed 2.25 percent because of the legislative suggestion contained in Chapter 30.[18]

Several of the Challengers objected to Bell's proposed offset on two grounds. First, they contended that the offset was based upon general historic data and has no relation to Bell's current rate structure. The Challengers also proposed that the offset in Bell's price stability mechanism should also account for Bell's productivity differential, which is the difference between the total factor productivity experienced by Bell and by the general economy. The productivity differential would account for Bell's increased productivity over the course of the plan. The Challengers also argued for the inclusion of a stretch factor, which would account for additional productivity gains that can reasonably be expected to occur under a system of incentive regulation. The Challengers argued that this factor would provide Bell with the incentive to increase its productivity level over the life of the Plan. Additionally, the Consumer Advocate and the Cable Association advocated the inclusion of an input price differential factor in the calculation of the inflation offset to reflect the lower increases for prices of telephone services than the input prices for the national economy as a whole. While none of the Challengers could agree on the percentage value to be assigned to Bell's productivity differential, they all presented evidence indicating that Bell's productivity differential, as determined by study data provided by Bell, was in excess of the 2.25 percent offset that it proposed. Moreover, the Challengers also differed on the percentage value to be assigned to the stretch factor.

The Commission, after stating that the 2.25 percent offset proposed by the legislature was a suggestion and did not prohibit it from exercising its fact finding powers to determine an alternative offset, concluded that the inflation offset must contain a productivity adjustment. Citing to the study data provided by Bell for the period between 1988 and 1992, which included Bell's own projections for its productivity growth, the Commission adopted Bell's historic productivity growth figure of 2.93 percent as the inflation offset value.[19] As to the Challengers' proposal to include a stretch factor in the inflation offset, the Commission, observing that there were imprecisions in the estimated factor values offered by the Challengers' witnesses and citing to the fact that there was uncertainty in the stretch factor theory, rejected its inclusion into the offset value. Additionally, the Commission declined to incorporate the input price differential into Bell's inflation offset, stating that:

> although the theory of using an input price differential factor and incorporating such an estimate in the overall inflation offset value of a PSM [price stability mechanism] formula has merit, the record evidence in this case is inadequate to sustain an appropriate figure. Furthermore, the analytical measurement techniques used to estimate the input price differential may be in need of future improvement.

Commission Opinion at 74–75.

On appeal, the Challengers argue that the Commission erred in determining that the inflation offset in Bell's price stability mechanism should be 2.93 percent. The Consumer Advocate argues that, in determining the inflation offset, the Commission should have looked to Bell's projected productivity and not just its historic productivity. Because Bell was predicting a productivity growth rate for the period between 1991 and 1996 that was substantially higher than the 2.93 percent offset imposed by the Commission,[20]

---

18. 66 Pa.C.S. § 3004(d)(2).

19. In so doing, the Commission concluded that this figure has been experienced by Bell and is therefore a reliable indicator of its productivity growth in comparison to the rate of inflation.

20. The Commission ordered the exact figure of Bell's predicted productivity growth rate to be proprietary, and therefore, confidential. This

Court also addressed the confidentiality of the information contained in the record on several occasions. On November 14, 1994, Bell filed a motion for a protective order to seal the record, and when no party opposed that motion, the matter was ordered sealed on December 6, 1994. Subsequently, on November 6, 1995, this Court issued an order stating that it will consider lifting the seal and directing the parties to address this

the Consumer Advocate argues that Bell's price stability mechanism will result in excessive rates.

The Cable Association argues that, by not including the stretch component and the input price differential component in the price stability mechanism, the Commission disregarded substantial evidence in the record and committed reversible error. Citing to the fact that the Commission admitted that the inclusion of an input price differential was meritorious, the Cable Association argues that the Commission failed to provide an adequate reason for not incorporating that component into the inflation offset. Additionally, the Cable Association argues that the Commission erred in refusing to include the stretch factor within the inflation offset based upon its finding that it was too speculative.

 In determining whether a utility's proposed rates are just and reasonable, the Commission is charged with the responsibility of resolving conflicts in testimony and weighing the evidence presented before it. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 163 Pa.Cmwlth. 367, 643 A.2d 130 (1994). Moreover, the Commission is vested with the discretion to decide what factors it will consider in setting or evaluating a utility's rates. *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 147 Pa.Cmwlth. 6, 607 A.2d 1132 (1992), *petition for allowance of appeal denied,* 539 Pa. 661, 651 A.2d 547 (1993). If, however, the Commission fails to resolve conflicting evidence or if it considers factors that are totally without support in the record, then a remand is warranted. *Duquesne Light, supra; West Penn Power, supra.* Moreover, if this Court, in exercising its discretion, determines that the Commission has

failed to make sufficient findings of fact to permit a meaningful appellate review, then it may remand the matter to the Commission. *Cytemp Specialty Steel Division, Cyclops Corp. v. Pennsylvania Public Utility Commission,* 128 Pa.Cmwlth. 349, 563 A.2d 593 (1989).

 In the present case, Bell and the Challengers presented conflicting testimony regarding the computation of the inflation offset. Bell adduced evidence showing that, historically, its costs grew approximately one percent more slowly than the general economy's in the period between 1982 and 1992. The Challengers, on the other hand, produced evidence indicating that the difference between Bell's future costs and the costs of the general economy will be greater than one percent. The Cable Association adduced evidence showing that Bell's total factor productivity between 1988 and 1992 was 2.93 percent. The Commission, after reviewing all of the parties' evidence, concluded that the figure given by the Cable Association was the most accurate and reliable because it was based upon the recent history regarding Bell's productivity growth.[21] We cannot disturb this conclusion on appeal.

 Similarly, the parties also presented divergent testimony concerning the inclusion of the stretch factor in Bell's price stability mechanism. Bell adduced evidence establishing that it was arbitrary and already accounted for in its proposed 2.25 percent offset. The Challengers adduced testimony indicating that the stretch factor should be within 1.5 to 2 percent. In concluding that the stretch factor was too uncertain and imprecise to include in the inflation offset, the Commission cited to Bell's evidence and the admission by the Consumer Advocate's witness that there is no pre-

---

matter during oral argument on the merits of the case. While only Bell opposes opening the sealed portions of the record, none of the parties object to opening the unsealed portions. Accordingly, in a separate order, we are directing that all of the documents that do not contain proprietary information be unsealed, and that the Consumer Advocate, as well as the Cable Association, file with this Court briefs from which the proprietary information has been redacted so that those briefs may also be viewed by the public.

21. Although the productivity growth rate set forth in Bell's second proprietary total factor productivity study, was addressed by at least one of the Challengers' witnesses, the Commission did not specifically address it in its decision. However, because the Commission rejected evidence regarding Bell's future productivity as being too speculative, we assume that it likewise refused to rely upon Bell's predicted productivity growth for the period between 1991 and 1996.

cise magnitude at arriving at a stretch factor. This evidence is sufficient to support the Commission's conclusion not to include the stretch factor in the offset value.

▇▇▇ On the other hand, we believe that the Commission erred in refusing to include an input price differential in Bell's inflation offset. After acknowledging that the theory of using the input price differential in the price stability mechanism has merit, the Commission concluded that the disparity among the witnesses' testimony regarding the calculation of the differential precluded it from being included into the inflation offset. Being charged with the responsibility of ensuring that the rates under the price stability mechanism remain reasonable throughout the duration of Bell's Plan, the Commission cannot recognize the input price differential as affecting those rates and then refuse to ascertain the value to be assigned to that differential by stating that the evidence is insufficient to reach an appropriate figure or that the analytical measurements used to calculate the input price differential may be in need of future improvements. Instead, the Commission should have reviewed the evidence and fixed a value that best approximates the input price differential, and if the evidence was insufficient to reach a determination on the issue, then the Commission should have required the parties to provide the evidence that it deemed to be necessary.[22]

### IV.

To provide an incentive for an LEC to rapidly deploy its broadband telecommunications network, Chapter 30, in addition to allowing an alternative form of regulation, allows the LEC to request the Commission to classify some of its services as competitive. 66 Pa.C.S. § 3005(a). The Commission must ensure that the services are, in fact competitive, and that there are competitive safe-

guards in place to protect the LEC's customers and competitors. 66 Pa.C.S. § 3005. If the Commission does classify an LEC's service as competitive, then the service will be deregulated. 66 Pa.C.S. § 3004(d)(3).

Bell's plan also proposed the deregulation of six services by requesting that those services be classified as competitive.[23] Those services include:

● Billing and Collection Services, which involves collecting account information and raw billing data, rating of raw billing data, rendering a bill to the customers and providing customer services;

● Directory Advertising, which involves all paid directory advertising, including yellow pages advertising and white pages bold advertising;

● Centrex, which is a central office based private telecommunications network that allows its users to connect with the public switched network and to communicate with others on the same Centrex system without accessing the public network;

● Paging, which provides for the one-way transmission of messages that notifies a paging customer that someone is attempting to call him or her;

● Repeat Call, which allows the customer to automatically redial the last number dialed by dialing an abbreviated code; and

● Speed Calling, which allows customers to make both local and long distance calls by dialing abbreviated dialing codes.

The Challengers objected to the classification of the services as being competitive. The ALJs agreed with the Challengers' contentions and denied competitive classification for all but the Billing Services. The Commission, however, found all of the proposed services to be competitive.

---

**22.** One of Bell's exhibits indicated an input price differential of 0.30 percent. Given this fact, the Commission acted arbitrarily in refusing to assign any value to the input price differential factor.

**23.** Pursuant to Section 3005(a) of the Code an LEC "may petition the commission for a deter-

mination of whether a telecommunications service or other service or business activity offered is competitive, either in conjunction with a petition to be regulated under an alternative form of regulation or at any time after the granting of the petition." 66 Pa.C.S. § 3005(a).

### A.

When an LEC has filed a petition for classification of competitive services, Section 3005(a)(1) requires that, after providing notice and conducting a hearing, the Commission at a minimum must make the following findings of fact:

- evidence of ease of market entry, including the existence and impact of cross subsidization, rights-of-way, pole attachments and unavoided costs;
- presence and viability of other competitors, including market shares;
- the ability of competitors to offer those services or other activities at competitive prices, terms and conditions;
- the availability of like or substitute services or other activities in the relevant geographic area;
- the effect, if any, on protected services;
- the overall impact of the proposed regulatory changes on the continued availability of existing services;
- whether the consumers of the service would receive an identifiable benefit from the provision of the service or other activity on a competitive basis; and
- the degree of regulation necessary to prevent abuses or discrimination in the provision of the service or other activity and any other relevant factors which are in the public interest.

66 Pa.C.S. § 3005(a)(1).[24] The findings set forth in Section 3005(a)(1) are mandatory findings that must be made by the Commission prior to classifying services as competitive. Absent such findings, the Commission cannot grant an LEC's request for a determination that certain services are competitive.

■■■■ In this regard, the Cable Association contends that the Commission, in classifying Bell's services as being competitive, failed to make the necessary findings and perform the analysis set forth above. As such, the Cable Association contends, the Commission's decision in this regard is arbitrary and constitutes an abuse of discretion. Similarly, Pittsburgh argues that the Commission failed to make these findings with respect to Bell's Centrex service, thus making its determination that this service was competitive erroneous.

Upon a review of the Commission's decision, we agree with the Cable Association's and Pittsburgh's contentions. For example, in discussing the classification of Directory Advertising, the Commission, while going to great extents to explain the relevant market in which Directory Advertising must be analyzed, failed to address the issues of ease of entry into that market, the ability of Bell's competitors to offer similar services at competitive prices, terms and conditions, the effect of the classification upon Bell's protected services, and the overall effect of the proposed changes upon Bell's existing services. Additionally, the Commission failed to address the degree of regulation necessary to prevent abuses or discrimination in the provision of the service.

Similar deficiencies may also be found in the Commission's classification of Bell's Centrex services as being competitive. The Commission failed to make any findings with respect to the ease of market entry for competitors that provide a similar service. As Pittsburgh points out in its brief, the Commission did not address any of the evidence concerning the fact that none of Bell's competitors could provide the Centrex or PBX switches plus the lines to connect a customer's dispersed facilities. Such evidence goes directly to the requisite findings regarding the existence and impact of rights-of-way, pole attachments and unavoided costs. Analogous deficiencies may also be found in the Commission's classification of Billing and Collection Services, Paging, Repeat Call and Speed Calling as being competitive. Given these deficiencies, the Commission's decision on this issue must be reversed.

### B.

To further protect an LEC's customers and competitors, Chapter 30 also imposes competitive safeguards upon services that the Commission classifies as competitive.

---

**24.** Moreover, the LEC seeking to have a particular service classified as competitive bears the burden of proving that the service is, in fact, competitive. 66 Pa.C.S. § 3005(a)(2).

Pursuant to Section 3005(a)(1), the Commission must also determine whether the LEC is complying with the following:

(1) The local exchange telecommunications company shall unbundle each basic service function on which the competitive service depends and shall make the basic service functions separately available to any customer under nondiscriminatory tariffed terms and conditions, including price, that are identical to those used by the local exchange telecommunications company and its affiliates in providing its competitive service. [The Unbundling Requirement].

(2) The price which a local exchange telecommunications company charges for a competitive service shall not be less than the rates charged to others for any basic service functions used by the local exchange telecommunications company or its affiliates to provide the competitive service. [The Imputation Requirement].

66 Pa.C.S. § 3005(e). Additionally, the LEC is prohibited from using "revenues earned or expenses incurred in conjunction with noncompetitive services to subsidize or support any competitive services [The Subsidization Requirement]." 66 Pa.C.S. § 3005(g)(2).

With respect to Bell's Centrex, Paging, Repeat Call and Speed Calling,[25] the Commission concluded that Bell's compliance with the aforementioned competitive safeguards was deficient. Nevertheless, the Commission determined that the safeguards were not threshold criteria that must be met prior to the classification of a competitive service. In reaching this determination, the Commission reasoned that it had not yet promulgated regulations pertaining to the Subsidization Requirement, and therefore, Bell could not have complied with it. Additionally, the Commission reasoned that the Imputation Requirement can only be implemented after the Subsidization and Unbundling require-

ments have been satisfied. The Commission stated:

> In order to make sure that the competitive safeguard provisions are promptly implemented, we shall direct the initiation of a separate formal proceedings to examine these issues.... All of the issues raised in this proceeding concerning cost allocations, unbundling and imputation should be pursued in the separate formal proceeding. Bell should be required to submit Total Service Long Run Incremental Cost Studies for competitive services as well as embedded direct analysis studies. The parties should pursue the issues of whether embedded direct analysis cost studies must be used to meet the statutory prohibition against noncompetitive service "support" of competitive services. We expect that tariff filings to implement the results of the competitive safeguard proceedings will be submitted.

The Commission then reasoned that, if it subsequently determines Bell's proposed competitive safeguards to be inadequate, it may reclassify the services pursuant to Section 3005(d).[26]

 Several of the Challengers appeal this determination, contending that the competitive safeguards are a prerequisite to the classification of an LEC's services as being competitive. The Consumer Advocate argues that, inasmuch as the competitive safeguards were designed to protect ratepayers and competitors, the classification of competitive services absent those safeguards would harm the ratepayers and competitors. Moreover, the Consumer Advocate argues, because Chapter 30 provides reasonable guidance for the application of the competitive safeguards, the absence of Commission regulations should not preclude their application.[27] Similarly, AT & T, MCI and Pittsburgh argue that, even if the Commission institutes subsequent proceedings for the im-

---

**25.** In its opinion, the Commission did not address the existence or applicability of the competitive safeguards with respect to the Directory Advertising and the Billing and Collection services.

**26.** Section 3005(d) provides that the Commission may reclassify a service that it has previously found to be competitive if it determines that

sufficient competition is no longer present or that the LEC is engaging in unfair competition.

**27.** The Consumer Advocate argues, regulations are intended to aid in the application of a regulatory statute. They are not designed to defeat the express language of the statute.

plementation of the competitive safeguards on Bell's proposed services, such action will be after the fact and will provide Bell with a significant unfair advantage over its competitors in the provision of the services.[28]

 The question presented, therefore, is whether Chapter 30 requires the competitive safeguards to be in place before services are deregulated, or may the Commission find the services to be competitive and impose the required safeguards at some future time. In the interpretation of Chapter 30, we are mindful that the construction given to a regulatory statute by the Commission must be given great weight and deference by this Court. *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 455 Pa. 52, 313 A.2d 156 (1973). However, if the agency's interpretation of its statute is clearly erroneous or is inconsistent with the intent or purpose of that statute, then it may be disregarded by this Court. *Id.; see also Terminato v. Pennsylvania National Insurance Co.*, 538 Pa. 60, 645 A.2d 1287 (1994). An agency's interpretation of an ambiguous statute that directly contravenes the purpose underlying that statute must be reversed by this Court.

Applying these principles of law to the present case, the General Assembly specifically stated that it enacted Chapter 30 to:

(2) Ensure that customers pay only reasonable charges for local exchange telecommunications services which shall be available on a nondiscriminatory basis.

(3) Ensure that rates for noncompetitive telecommunications services do not subsidize the competitive ventures of providers of telecommunication services.

. . . . .

(7) Promote and encourage the provisions of competitive services by a variety of service providers on equal terms throughout all geographic areas of this Commonwealth.

66 Pa.C.S. § 3001. Contrary to the interpretation placed upon Chapter 30 by the Commission, the plain language provides that the Commission, in approving a petition for alternative form of regulation, must ensure that the grant of the petition will not "unduly or unreasonably prejudice or disadvantage a customer class or providers of competitive services." 66 Pa.C.S. § 3004(d)(4).

To further advance its purpose, the General Assembly also required the existence of the competitive safeguards to protect customers and competitors from an LEC's use of services that the Commission has classified as competitive. 66 Pa.C.S. §§ 3005(e), 3005(g). These safeguards are designed to prevent the LEC from engaging in unfair competition by charging its competitors more for a service than it charges its customers and by subsidizing the costs associated with the provision of the competitive services with the revenues it acquires from its noncompetitive services.

Were we to adopt the Commission's interpretation that these competitive safeguards are not a prerequisite to the classification of a service as competitive and the subsequent deregulation of that service, then we would be contravening the purpose behind Chapter 30. The lack of the competitive safeguards at the initial deregulation of an LEC's competitive services would permit the LEC to cross-subsidize the competitive services or charge its competitors a higher rate for those services than it charges its customers.[29] While the Commission may be correct in its assertion that any unfair competition by Bell may be remedied in subsequent proceedings, the ability of Bell to engage in unfair competition until those proceedings are completed provides it with an unfair advantage over its competitors. Such a result would conflict with the stated purposes behind Chapter 30,

---

**28.** In making this argument, AT & T and MCI cite to the fact that, at least with respect to the Centrex services, Bell has failed to satisfy the Imputation Requirement. This failure, AT & T and MCI contend, will allow Bell to continue charging them seven cents *per minute* on Centrex Extend calls while charging its customers only seven to eleven cents *per call*.

**29.** This is evidenced in the present case by the disparate charges that Bell imposes for its Centrex services depending upon whether the user is a Bell customer or one of its competitors.

and therefore, the Commission's interpretation must be rejected.

We observe that the Commission's finding that Bell's Plan lacks competitive safeguards with respect to the Centrex, Paging, Repeat Call and Speed Calling services completely precludes their classification as being competitive until the competitive safeguards are imposed. However, because the Commission did not address the existence of competitive safeguards for the Directory Advertising and Billing and Collection Services, the matter will be remanded in order for it to do so. Only if the Commission finds the safeguards to be adequate and makes the requisite findings of fact set forth in Section III.A. of this Opinion with respect to these two services, may it classify these services as competitive. Until these required findings are made, the Commission is directed to modify Bell's alternative form of regulation to include these revenue streams in Bell's pricing mechanism.

## V.

■ In exchange for being regulated under an alternative form of regulation and having its services deregulated because of their competitive classification, Chapter 30 of the Code requires an LEC to file a network modernization implementation plan. 66 Pa. C.S. § 3003(b). Because the plan is designed to further the underlying purpose of Chapter 30, i.e., the accelerated deployment of a universally available broadband telecommunications network, it must include the following:

(1) Each local exchange telecommunications company shall commit to universal broadband availability and shall commit to converting 100% of its interoffice and distribution telecommunications network to broadband capability by December 31, 2015. The plan shall identify the local exchange telecommunications company's present and projected deployment of digital switches in central offices, fiber optic trunk line capability between central offices, intelligent network signaling capability and integrated services digital network (ISDN) availability in central offices.

(2) Each local exchange telecommunications company shall reasonably balance deployment of its broadband network be-
tween rural, urban and suburban areas within its service territory.

(3) The deployment of broadband facilities shall be in or adjacent to public rights-of-way abutting public schools, including the administrative offices supporting public schools; industrial parks; and health care facilities.

(4) A local exchange telecommunications company shall file a network modernization implementation plan with its petition for alternative form of regulation with the commission which identifies and describes in detail the company's implementation plan for complying with paragraphs (1), (2) and (3). The plan shall specify interim target dates at not more than five-year intervals for deployment of its broadband network.

66 Pa.C.S. § 3003(b).

After providing notice and a hearing, the Commission is authorized to approve the plan, approve the plan with modifications, or deny the plan as not being reasonably designed to meet the requirements of Chapter 30. 66 Pa.C.S. § 3004(b). In making this determination, the Commission is required to review the plan to determine if it is consistent with the provisions of Chapter 30 and in the public interest. 66 Pa.C.S. § 3004(c).

The Commission found that Bell's network modernization plan failed to meet the criteria set forth in Section 3003(b) of the Code. In addition to determining that Bell's plan did not reasonably balance deployment between urban, suburban and rural areas, the Commission also concluded that Bell's proposed deployment rate was inadequate. Based upon these findings, the Commission modified Bell's plan by reclassifying several areas from urban to suburban, by accelerating Bell's proposed deployment, and by requiring Bell to submit a three year deployment plan that contained more detail such as the location of the upgrades in switches and the location for the placement of fiber optic lines.

■ The Consumer Advocate and the Cable Association challenge the Commission's decision on this issue, arguing that it was without authority to modify the plan as it did. They argue that, in light of the Commission's

finding that Bell's plan lacked the required detail, the Commission should have rejected that plan. The Consumer Advocate argues that the Commission is without the authority to require the submission of a detailed plan after it has approved the alternative form of regulation. Rather, the Consumer Advocate argues, the Commission must find that the plan satisfies the Chapter 30 requirements prior to granting approval of the alternative form of regulation. The Cable Association argues that the plan, as modified by the Commission, fails to create a reasonable balance in the deployment of the broadband network between urban, suburban and rural areas.

 As previously indicated, an administrative agency's interpretation and application of a regulatory statute must be afforded considerable weight and deference by a reviewing court. *Pennsylvania Human Relations Commission v. Uniontown Area School District,* 455 Pa. 52, 313 A.2d 156 (1973). Judicial deference is particularly warranted where the statutory scheme is technically complex and its application requires the expertise of the administrative agency. *Nationwide Mutual Insurance Co. v. Foster,* 143 Pa.Cmwlth. 433, 599 A.2d 267 (1991). Moreover, where the language of the statute is ambiguous and unclear regarding its application, this Court should not substitute its interpretation over that of the administrative agency. *See National Fuel and Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 137 Pa.Cmwlth. 621, 587 A.2d 54 (1991). An administrative agency's interpretation of a statute that it is responsible for enforcing should not be overturned by this Court unless that interpretation is clearly erroneous. *Menoyo v. Bureau of Professional and Occupational Affairs,* 157 Pa.Cmwlth. 292, 629 A.2d 295 (1993).

In the present case, although Chapter 30 sets forth in detail the information that must be provided in an LEC's network modernization implementation plan, it also grants discretion in the Commission to approve that plan with modifications if it determines that the plan is insufficient to meet the requirements of Chapter 30. Moreover, the Commission is given the authority to review the plan to determine whether it is in furtherance of the public interest. Using the authority granted to it under Chapter 30, the Commission, after determining that Bell's plan was not sufficiently specific to comply with Chapter 30, modified the plan so that it did satisfy these requirements. The Commission's decision on this issue was in accordance with the primary purpose of Chapter 30, i.e., to encourage the accelerated deployment of a state of the art broadband telecommunications network throughout the Commonwealth.[30] Because we cannot say that the Commission's actions in enforcing Chapter 30 were clearly erroneous, the Commission's interpretation and application of the network modernization implementation plan provisions of Chapter 30 cannot be reversed.

Accordingly, the decision of the Commission is reversed with respect to its classification of the Centrex, Paging, Repeat Call, and Speed Call services as being competitive. The decision is vacated and remanded with respect to its classification of the Directory Advertising and Billing and Collection services as being competitive, with the direction to make the necessary findings of fact on remand. The decision is also vacated and remanded with respect to the calculation of the inflation offset value in Bell's price stability mechanism. The Commission is directed to calculate and include an input price differential in the price stability mechanism. In all other respects, the Commission's decision is affirmed.

### ORDER

AND NOW, this 22nd day of December, 1995, upon consideration of the order of the Pennsylvania Public Utility Commission at Nos. P–00930715, P–00930715C001, and P–

---

**30.** Were we to adopt the position advanced by the Challengers, the Commission would be required to reject *every* plan that did not meet the requirements of Chapter 30. Not only is this contrary to the express powers granted to the Commission under that Chapter, but it also would defeat the Chapter's purpose of encouraging the rapid deployment of broadband telecommunications services.

00930715C002, dated June 28, 1994, it is ordered that:

1. The portion of the order imposing a modified price stability mechanism is vacated, and the matter is remanded with specific directions to the Commission to calculate and include an input price differential into the inflation offset value of the price stability mechanism.

2. The portion of the order classifying Bell Atlantic—Pennsylvania, Inc.'s, Directory Advertising and Billing and Collection services as competitive is vacated, and the matter is remanded for the Commission to make the requisite findings of fact under 66 Pa.C.S. § 3005(a)(1) and to determine the adequacy of the proposed competitive safeguards.

3. The portion of the order classifying Bell–Atlantic Pennsylvania, Inc.'s, Centrex, Paging, Repeat Call, and Speed Calling services as competitive is reversed.

4. The Pennsylvania Public Utility Commission is directed to modify Bell's rate mechanism to include the revenue streams from Bell's proposed competitive services until such time as it makes the requisite findings of fact under 66 Pa.C.S. §§ 3005(a)(1), 3005(e), and 3005(g).

5. In all other respects, the order is affirmed.

Jurisdiction relinquished.

COLINS, President Judge, did not participate in the decision of this case.