**MARTIN MEDIA, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 5, 1997.

Decided Aug. 22, 1997.

Reargument Denied Oct. 17, 1997.

Samuel P. Kamin and Ann Marie Williams, Pittsburgh, for petitioner.

Jeffrey L. Giltenboth, Pittsburgh, for respondent.

Before PELLEGRINI and FLAHERTY, JJ., and SILVESTRI, Senior Judge.

FLAHERTY, Judge.[1]

Martin Media (Martin) appeals from an order of the Secretary of Transportation (Secretary), dated October 21, 1996, which denied Martin's application for an outdoor advertising permit pursuant to the Outdoor Advertising Control Act of 1971(Act).[2] We affirm.

The relevant facts are not disputed. On January 3, 1995, Martin filed an application with the Department of Transportation (DOT) for an advertising device permit for the placement of a sign, described as "one

1. This opinion was reassigned to the authoring Judge on July 9, 1997.

2. Act of December 15, 1971, P.L. 596, *as amended*, 36 P.S. §§ 2718.101—2718.115.

3. For a diagram of the area, see figure 1, attached.

(1)–14' × 48' illuminated bulletin," to be erected on the Airport Parkway (Parkway), Routes 22, 30 and 60, 500 feet west of the Campbell's Run Road exit in Collier Township, Allegheny County. (R., Item No. 3 at 10.)

Campbell's Run Road, a two-lane highway, and the Parkway, a divided four-lane highway, run generally east and west.[3] At the area herein relevant, both roadways are substantially parallel. Approximately 250 feet separates the southerly side of Campbell's Run Road and the northerly side of the Parkway. For traffic traveling in a westerly direction on the Parkway, there is an exit ramp to Campbell's Run Road. The east-west traffic on the Parkway is separated by continuous cement barriers. For traffic on the Parkway traveling in a westerly direction, there are two lanes for through traffic separated by broken white lines ("the main-traveled way"), until a third westbound lane, the deceleration lane, begins the Campbell's Run Road exit east of the exit ramp. The deceleration lane is separated from the main-traveled way by a solid white line for a short distance between the two northerly main-traveled lanes for westbound through traffic on the Parkway and that part of the exit lane just prior to its turn to the north away from the westbound main-traveled lanes of the Parkway.[4] As the exit ramp begins the turn to the north, the solid white line extending east from the "neutral area" divides into two solid white lines, one of which continues westerly as the southern edge of the "neutral area" and continues westerly as the northern edge of the Parkway. At the split of the solid white line which separates the deceleration lane from the main-traveled lanes of the Parkway at the beginning of the "neutral area," it also continues on in an arc as the northerly edge of the "neutral area" after which it becomes the westerly edge of the exit lane.

4. The solid white line extends east from the "neutral area" for an unknown distance between the deceleration lane and the main-traveled way of the westbound Parkway. Figure 1 incorrectly shows a dotted line instead of this solid line. (Appellant's Br., p. 15.)

In the area between the solid white line that continues along the southerly edge of the "neutral area" and thereafter as the northerly edge of the Parkway and the solid white line which is along the westerly side of the exit ramp are five separate white lines, each touching both of the aforesaid solid white lines; this area is identified as a "neutral area."[5] The pavement upon which the "neutral area" is painted continues westward beyond the "neutral area" until it meets the rumble strips and shoulder area abutting the northerly edge of the Parkway (at point "P" on figure 1) and the rumble strips in the exit ramp. This westerly edge of the paved portion at the exit is a continuation of the paving from the deceleration lane westward under the paint of the "neutral area" to the places where it meets the rumble strips abutting the exit ramp and the main-traveled way on the Parkway.[6]

DOT denied Martin's application for an advertising device permit by letter dated August 29, 1995, on the ground that Martin's proposed sign is not 500 feet from the end of pavement widening at the exit as per DOT regulations at 67 Pa.Code § 445.4(b)(2)(i).[7] (R.R. 14a.) Martin appealed that denial and requested a hearing, which was held on March 21, 1996. The Hearing Officer, by proposed report and order of August 21, 1996, affirmed DOT's decision to deny the permit. On September 18, 1996, Martin filed exceptions to the Hearing Officer's August 21, 1996 order, as well as a Motion to Present Oral Argument on the matter. On October 21, 1996, the Secretary issued an order denying Martin's exceptions, making the order contained in the proposed report final, and denying Martin's Motion to Present Oral Argument.

The opinion of the Hearing Officer, which was adopted by the Secretary, states, in relevant part, as follows:

The Department measures from a change in the paving from main-traveled way paving to shoulder paving as best shown on P–5.[8] Martin, on the other hand, measures from the point of painted delineations that direct traffic.[9] The regulations and the Department use a solid permanent point that is easily determined on the ground and on plans. Martin chooses an ephemeral point that may not always be there or in the same location depending on weather or changing traffic control regulations. The word "pavement" in the regulations clearly supports the Department's position. The Department's interpretation of it's [sic] own regulations control unless clearly erroneous or inconsistent with the enabling statute or the regulations themselves. *Popple v. Commonwealth,* 133 Pa. Commonwealth Court 375, 575 A.2d 973 (1990).

(R.R. 98a–99a.)

The Hearing Officer concluded as follows: (1) DOT's interpretation of its regulation at 67 Pa.Code § 445.4(b)(2)(i) is not clearly erroneous and is consistent with the regulation and the Act in that it designates a permanent, easily identified feature of pavement; (2) Martin's interpretation is not supported by the language of the regulation and is based on a painted, rather than permanent, feature of the road; and (3) the proposed sign is within 500 feet of the ending of pavement of the main-traveled way of the exit ramp.

Section 5(c)(2)(i) of the Act, 36 P.S. § 2718.105(c)(2)(i), provides, in relevant part, as follows:

P.S. § 2718.105(c)(2)(i), except that in paragraph (2)(i) of the Code, DOT substituted the word "may" for the word "shall." Such change, however, has no effect on the disposition of the matter before us.

---

5.  67 Pa.Code § 211.1167 states that "[c]hannelizing lines at exit ramps of expressways provide a neutral area which reduces the probability of collision with the curb nose and also directs exiting traffic at the proper angle for smooth divergence into the ramp."

6.  The measurements of the triangular area of pavement referred to as the westerly edge of the exit and west of the "neutral area" are not set forth in the record.

7.  The language of this section of the Code is identical to Section 5(c)(2)(i) Act, *as amended,* 36

8.  This point, which is represented by Point P on the attached figure 1, is at the westerly end of the triangular area of pavement lying west of and abutting the "neutral area."

9.  This point is represented by Point M on figure 1, attached.

(2) Spacing of signs:

(i) Along the interstate system and limited access highways on the primary system, no two sign structures shall be spaced less than five hundred feet apart; and outside the boundaries of cities of all classes and boroughs, *no structure may be erected adjacent to or within five hundred feet of an interchange* ..., *measured* along the interstate or limited access primary *from the* beginning or *ending of pavement widening at the exit from* or entrance to *the main-traveled way.* (Emphasis added.)

The measured distance from the beginning point used by DOT to the proposed sign is 366 feet. Thus, pursuant to the Act, Martin's proposed sign location would be prohibited. The measured distance between the beginning point used by Martin, i.e., the easterly point of the "neutral area," and the proposed sign, is 586 feet. Thus, based upon Martin's interpretation of the law, the proposed location of the sign would be permitted under the Act.

■ On appeal, we must determine whether DOT properly denied Martin's outdoor advertising device permit in accordance with Section 5(c)(2)(i) of the Act and 67 Pa.Code § 445.4(b)(2)(i).[10]

■ Martin argues on appeal that *its* interpretation of the Act and Code with respect to the proper beginning point for measurement provides a more definite beginning point, is supported by substantial evidence, and is the legally correct interpretation of the statute and regulation.[11]

■ We note, however, that an agency's interpretation of a regulatory statute must be afforded considerable weight and deference by a reviewing court. *See Popowsky v. Pennsylvania Public Utility Commission,* 669 A.2d 1029, 1044 (Pa.Cmwlth.1995), *peti-* *tion for allowance of appeal granted in part and denied in part,* 545 Pa. 657–58, 680 A.2d 1165 (1996). The agency's interpretation of its statute may not be disregarded by this Court unless it is clearly erroneous or is inconsistent with the intent or purpose of the statute. *Id.*

■ Here, we believe that DOT's interpretation of the Act, far from being clearly erroneous, is in fact more plausible and consistent with the purpose of the Act than that offered by Martin; accordingly, we believe this Court should defer to DOT's interpretation of the statute which it is charged with administering.

Under the language of the Act, the correct location of the beginning point for determining the distance to the proposed sign west of the Campbell's Run Road exit is to be measured from the "ending of pavement widening at the exit from ... the main-traveled way." 36 P.S. § 2718.105(c)(2)(i).

Under the applicable regulations, the "exit" begins with the deceleration lanes. *See* 67 Pa.Code § 445.2 (defining "exit roadway" to include deceleration lanes). The term "pavement widening" is the crucial place from which the Act specifies measurements are to be made, to wit: in the case of an entrance ramp 500 feet "from the beginning ... of pavement widening at the ... entrance to the main-traveled way," and in the case of an exit, 500 feet "from the ... ending of pavement widening at the exit from ... the main-traveled way." 36 P.S. § 2718.105(c)(2)(i).

Although the word "pavement" is not defined in the Act or the Code, DOT relies upon "pavement" to be the paved portion of the roadway and exit, exclusive of the shoulder, as distinguished from the markings painted on the paved portion.

Webster's Dictionary defines pavement as "the artificially covered surface of a public

---

10. Our scope of review is limited to determining whether constitutional rights have been violated, an error of law committed, or whether necessary findings of fact are not supported by substantial evidence. *Miller's Smorgasbord v. Department of Transportation,* 139 Pa.Cmwlth. 385, 590 A.2d 854, 855 n. 3 (1991).

11. We note that the existence of evidence to support an interpretation contrary to that adopted by DOT is immaterial; the agency's interpretation of the regulation is controlling unless shown to be clearly erroneous. *George Washington Motor Lodge Co. v. Department of Transportation,* 118 Pa.Cmwlth. 552, 545 A.2d 493, 495 (1988).

thoroughfare." Merriam Webster's Collegiate Dictionary 853 (10th ed. 1993).

It would appear, therefore, that the Legislature intended "the ending of pavement widening at the exit" as used in the Act to mean the end of the paved surfaced area of the exit next to the main-traveled highway and not the beginning of the painted "neutral area" which is 134 feet to the east.

Martin does not contest the fact that the pavement widening extends past the point at the beginning of the "neutral area" where it contends the measurement should start. Martin's principal contention is that DOT's point of measurement is not "at the exit" but beyond the exit. The disagreement arises because the boundaries of the exit are not defined. DOT considers the end of the exit to be at the end of pavement widening, i.e., where the pavement for the main-traveled road meets the paving for the shoulder. On the other hand, Martin asserts a narrower interpretation, arguing that the exit ends where the painted lines of the "neutral area" direct vehicles to turn from the deceleration lane to the exit ramp lane. The statute, however, is not based on painted lines or a "neutral area," but on the end of pavement widening at the exit. Even if the "neutral area" were at the exit, it would not be at the end of pavement widening. Martin thus bases its interpretation on the location of the painted lines in the "neutral area," none of which is contained in the statute, nor are they at the end of the pavement widening area.

■ Obviously, the intent of the Legislature in enacting this part of the Act was to control the proximity of certain-size signs at the exits from high-speed highways where vehicles are in the process of maneuvering to change directions while reducing speed, so that the distraction such signs would create for the exiting operator would be greatly reduced or diminished, if not eliminated.

Here, the agency's interpretation places the nearest location of the sign in this case 134 feet farther away from the exit than that offered by Martin. DOT's interpretation must be afforded considerable weight and deference by this court unless clearly erroneous or inconsistent with the intent or purpose of the statute. *Popowsky.* Clearly, Martin's interpretation is inconsistent with the intent and purpose of the statute to move signs further away from vehicles exiting from the main-traveled way, which is simply the highway on which through traffic is carried, the Parkway West in this case.

DOT's interpretation, which fixes the point of measurement on the basis that the exit ends at the end of the pavement widening area, is consistent with the statutory requirement that the measurement start at the end of the pavement widening area, harmonizes with the intent and purpose of the statute and should, therefore, be given great weight and deference by this court. Because DOT's interpretation of the Act is not clearly erroneous or inconsistent with the purpose of the Act, it should not be disregarded by this Court. *See Popowsky.* This being the case, DOT properly denied Martin's application for an outdoor advertising device permit under Section 5(c)(2)(i) of the Act and 67 Pa.Code § 445.4(b)(2)(i).

For the foregoing reasons, the order of the Secretary is accordingly affirmed.

### ORDER

NOW, August 22, 1997, the order of the Secretary of Transportation, dated October 21, 1996, denying Martin Media's application for an outdoor advertising permit is hereby affirmed.

SILVESTRI, Senior Judge, dissenting.

Because, contrary to the majority, I would reverse the Department of Transportation's (DOT) denial of Martin Media's application for an outdoor advertising permit, I dissent.

While it is recognized that an agency's interpretation and application of a regulatory statute must be afforded considerable weight and deference by a reviewing court, it is equally true that where the agency's interpretation of its statute is clearly erroneous or is inconsistent with the intent or purpose of the statute, it must be disregarded by this Court. *Popowsky v. Pennsylvania Public Utility Commission,* 669 A.2d 1029, 1044 (Pa. Cmwlth.1995), *petition for allowance of ap-*

*peal granted in part and denied in part,* 545 Pa. 657–58, 680 A.2d 1165 (1996).

The majority relies on *Popowsky* as support for the proposition that this Court should give an administrative agency's interpretation of a statute deference, and concludes that here, because DOT's interpretation regarding where the beginning point of measure should be for purposes of Section 5(c)(2)(i) of the Outdoor Advertising Control Act of 1971(Act) [1] is not clearly erroneous we should affirm its interpretation. However, it is noted that the majority fails to point out in its opinion that in *Popowsky* this Court stated that such deference is particularly relevant where the statutory scheme is technically complex and its application requires the agency's expertise, or where the statutory language is ambiguous and unclear regarding its application. *See Popowsky,* 669 A.2d at 1046. Here, the statutory and regulatory provisions are not technically complex, nor is any expertise required to ascertain the meaning of said provisions. [2] Where, the determination of the meaning of the words and phrases in a statute are neither technically complex nor require expertise, such meaning historically has been the function of the courts to ascertain and carry out the legitimate function of the legislature.

Section 105(c)(2)(i) of the Act, 36 P.S. § 2718.105(c)(2)(i), as herein relevant, provides:

(2) Spacing of signs:

(i) Along the interstate system and limited access highways on the primary system, no two sign structures shall be spaced less than five hundred feet apart; and outside the boundaries of cities of all classes and boroughs, no structure may be erected adjacent to or within five hundred feet of an interchange ..., measured along the interstate or limited access primary from the beginning or ending of pavement widening at the exit from or entrance to the main-traveled way.

The foregoing statutory provision provides that no structure may be erected within 500 feet of an interchange. The 500 feet is measured along the limited access primary from, (a) the beginning of ... pavement widening at the ... entrance to the main-traveled way; or (b) the ending of pavement widening at the exit from the main-traveled way. Here, it is undisputed that the interchange involved is an exit interchange.

The foregoing words and phrases in the Act are clear and unambiguous and mean when a vehicle enters upon an exit ramp no part of which abuts or is part of the main-traveled way of the limited access highway, that is where the point measurement begins for purposes of determining the 500 foot distance to a proposed sign. That point is at the beginning of the neutral area identified in Figure 1, attached to the majority opinion.

The error presented by DOT's beginning point of measure is that there is neither the "ending of pavement widening" nor "an exit" ramp at such point. To the contrary, at DOT's beginning point of measure, there is only an area of concrete in the berm containing concrete rumble strips; importantly, there is no exit from the main-traveled way at such concrete area in the berm.

For purposes of Section 105(c)(2)(i) of the Act, both the terms "exit" and "entrance" must be read together with "widening" of the highway—as to an entrance, the point of measurement is to start at the beginning of the widening of the ramp; as to an exit, the point of measurement is to start from the end of the pavement widening. There is no question that the Act contemplates the beginning or ending of pavement widening only at an entrance or exit ramp.

Based on the foregoing, I would hold, contrary to the majority, that the Act requires that the beginning point of measurement, for purposes of determining the distance to a proposed sign, is at the beginning of the neutral area created by the divergence of the exit ramp and the main-traveled way. The beginning point of measurement established

---

**1.** Act of December 15, 1971, P.L. 596, *as amended,* 36 P.S. §§ 2718.101—2718.115.

**2.** It is noted that the language of 67 Pa.Code § 445.4(b)(2)(i) is identical to the statutory language at issue here.

by DOT is well beyond the point at which vehicles exit from the main-traveled way, beyond the neutral area, and beyond the interchange. There is no support either in the record or in the law for DOT's determination and the majority's affirmance thereof.

Accordingly, I would vacate the order of DOT denying Martin's application for an outdoor advertising permit and remand with directions that DOT issue said permit.