**Sandra K. NORVELL, Petitioner**

v.

**STATE CIVIL SERVICE COMMISSION (Department of Conservation and Natural Resources), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 30, 2010.

Decided Jan. 20, 2011.

---

Margaret J. Fried, Pittsburgh, for petitioner.

Virginia J. Davison, Assistant Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and McCULLOUGH, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Sandra K. Norvell petitions for review of an order of the State Civil Service Commission (Commission) that dismissed Norvell's challenge of her removal from probationary employment as a Park Ranger 1 with the Department of Conservation and Natural Resources (DCNR). We affirm.

Norvell had been employed in Raccoon State Park (Park) since June, 1990, as a seasonal Lifeguard Supervisor. Norvell was hired into emergency status, and changed to probationary status in August, 1990. Her seasonal employment generally lasted from Memorial Day to Labor Day each year, and she was placed on a leave of absence after Labor Day, and returned from that leave prior to the next Memorial Day. In early 2008, the Park's Assistant Manager, Deanna Schall, informed Norvell that all Lifeguard positions at the Park were to be eliminated, resulting in the unavailability of Norvell's usual seasonal position. Schall informed Norvell of her employment alternatives, which included the potential for movement to a Park Ranger position. Norvell thereafter took the civil service examination for Park Ranger employment, and was informed that she was to begin work as a Park Ranger 1 at the Park with a start date of May 10, 2008. Norvell's selection notice for the new position stated that she would be placed in probationary status.

The DCNR used Park Ranger 1 employees as uniformed public relations employees with duties throughout the Park. In discharging those duties, three vehicles were available for use by the Rangers within the Park: a 2000 Chevrolet Cavalier sedan, a 2004 Dodge Dakota truck, and a 2003 Dodge Intrepid sedan. During a meeting attended by Norvell on May 21, 2008, Schall advised all Park Rangers that the Park vehicles were to be used in the order listed above.

On May 24, 2008, Norvell arrived at the Park for her scheduled work, and ultimately left the Park office area at approximately 10:30 a.m. driving the second-listed vehicle, the Dakota. Norvell returned the Dakota to the office at approximately 12:40 p.m. On his way to the office, Park Manager Albert Wasilewski observed Norvell driving the Dakota, and subsequently saw the first-listed Cavalier parked at the office. Before leaving for the day, Norvell was instructed to wash the Dakota, during which activity Norvell noticed that the Dakota—which was painted white in color— had bumper damage, dents, and paint scrapes on the passenger side of the vehicle. Norvell did not report the observed damage.

On the same day—May 24, 2008—citizen Raymond Spellman and his children parked their car on Lakeshore Lodge Drive within the Park at approximately 9:00 a.m. Upon returning to his car at approximately 11:00 a.m., Spellman noticed damage to the back passenger side of his vehicle, with white paint having been transferred to the damaged area. Spellman did not see the accident that caused the damage to his vehicle, and no note had been left for him from any other driver. Spellman thereafter informed the Park office of the accident on Thursday, May 29, alleging that his vehicle had been hit by a Park Ranger. Spellman took and transmitted photos of the damage at the Park office's request.

Schall reviewed Spellman's complaint and allegations, and examined the Park vehicles, including the damaged Dakota. On May 30, 2008, Schall met with Norvell to discuss the matter, and while Norvell admitted to having been in the Lakeside

Lodge Road area on the morning at issue, she indicated that she did not know anything about the claimed hit-and-run incident.

Per DCNR policy, Schall contacted the Pennsylvania State Police to report the accident and request an investigation. State Trooper Blake Coble was assigned to the investigation, and thereafter reviewed the vehicle logs for the Dakota, the pictures of the vehicles' respective damage, and the Dakota itself. Trooper Coble spoke with Schall and Spellman, and interviewed Norvell in person. Based on the results of his investigation, Trooper Coble issued a citation on June 6, 2008, charging Norvell with striking an unattended vehicle and leaving the scene without notifying the vehicle's owner.

Thereafter, a pre-disciplinary conference (PDC) was scheduled on June 20, 2008, for which Norvell received written notice of the issues to be discussed. The PDC was attended by Norvell, Schall, and additional DCNR management and administrative personnel. During the PDC, when asked whether she had hit Spellman's car, Norvell purportedly replied "I don't remember hitting the car, but I must have because I was the only one that had the car, the Dakota." *See* Certified Record (C.R.), Notes of Testimony (N.T.) of Feb. 25, 2009, at 341.

By letter dated June 23, 2008, Norvell was informed of her removal from her probationary status position as Park Ranger 1 for failure to follow DCNR instructions, policies, and/or procedures, for neglect in the use of DCNR property and damage thereto, and for deliberate concealment and/or misrepresentation, as well as creating an appearance of impropriety and/or casting the DCNR in a bad light with the public. Norvell appealed her re-

moval to the Commission, and hearings on the matter ensued.

Subsequently, the Commission issued a Decision and Order dated August 28, 2009. In its Decision, the Commission concluded, *inter alia,* that Norvell, throughout her entire tenure as a seasonal Lifeguard Supervisor, remained a probationary employee and not a regular status employee under the relevant regulations controlling employment status in the face of Norvell's regular extended leaves of absence due to her seasonal employment. The Commission further concluded that the status of Norvell's employment during her tenure as a seasonal employee was determinative in this matter due to the assignment, under the Civil Service Act (Act),[1] of the burden upon a temporary status employee to present evidence in support of her action challenging her removal. A regular status employee challenging her removal, under the Act and the instant facts, enjoys the procedural advantage of the assignment of a burden upon the appointing authority— in this case, the DCNR—to demonstrate that the employee's removal was taken for just cause. Upon reviewing the arguments of both Norvell and the DCNR, the Commission concluded that Norvell remained a probationary status employee throughout her tenure as a seasonal Lifeguard Supervisor, and that the record evidence presented did not satisfy her burden to establish that her removal from probationary employment was due to discrimination in violation of the Act. Norvell now petitions to this Court for review of the Commission's order.

■ Our scope of review is limited to a determination of whether the Commission committed an error of law, whether there has been a violation of constitutional rights, or whether there is substantial evi-

---

1. Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. §§ 741.1–741.1005.

dence to support the findings of fact necessary to support the adjudication. *Wernersville State Hospital v. Peters*, 659 A.2d 67 (Pa.Cmwlth.1995).

Norvell first argues that the Commission erred in allocating the burden of proof in the proceedings before it, in that it incorrectly determined that she was a probationary status employee despite her cumulative years of service as a seasonal Lifeguard Supervisor, and that the Commission's Decision should be reversed due to the DCNR's failure to meet its evidentiary burden.

Challenges to an employee's separation from employment are founded in Section 951 of the Act: [2]

Hearings

(a) Any regular employe in the classified service may, within twenty calendar days of receipt of notice from the appointing authority, appeal in writing to the commission. Any permanent separation, suspension for cause, furlough or demotion on the grounds that such action has been taken in his case in violation of the provisions of this act, upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

(b) Any person who is aggrieved by an alleged violation of section 905.1 [3] of this act may appeal in writing to the commission within twenty calendar days of the alleged violation. Upon receipt of such notice of appeal, the commission shall promptly schedule and hold a public hearing.

The parties' respective burdens under the two applicable subsections of Section 951 are set forth in the regulations promulgated thereunder, in Sections 105.15(a) and 105.16(a) of Title 4 of the Pennsylvania Code:

§ 105.15. Procedure under section 951(a) of the [A]ct (71 P.S. § 741.951(a)).

(a) The appointing authority shall go forward to establish the charge or charges on which the personnel action was based. If, at the conclusion of its presentation, the appointing authority has, in the opinion of the Commission, established a prima facie case, the employee shall then be afforded the opportunity of presenting his case.

4 Pa.Code § 105.15(a).

§ 105.16. Procedure under section 951(b) of the [A]ct (71 P.S. § 741.951(b)).

(a) The appellant shall go forward to establish the charge or charges of discrimination. If at the conclusion of this presentation, the appellant has, in the opinion of the Commission, established a prima facie case, the appointing authority shall then be afforded the opportunity to reply to the charges.

4 Pa.Code § 105.16(a).

■ We note that while Norvell challenged her removal initially under Section 951(b) of the Code, which would place the initial burden on Norvell to support her allegations, she presented arguments to the Commission in support of her assertion that she is entitled to a hearing under

---

**2.** *Added* by the Act of Aug. 27, 1963, P.L. 1257, as *amended*, 71 P.S. § 741.951.

**3.** Section 905.1 of the Act, *added* by the Act of Aug. 27, 1963, P.L. 1257, 71 P.S. § 741.905a, states:

Prohibition of discrimination

No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors.

Section 951(a) of the Act, which would place the burden upon the DCNR to demonstrate that Norvell's removal was taken for just cause under the foregoing regulations. *See* Commission Opinion (Comm. Op.) at 10–11, and supporting Exhibits. The Commission's Opinion in this matter accurately summarizes Norvell's arguments, in our initial analysis of Norvell's petition to this Court:

> The arguments addressed by [Norvell] include: 1) an assertion that because she had received satisfactory performance evaluations and had been employed as a Lifeguard Supervisor for more than eighteen months (cumulatively), she had met the requirements for regular civil service status; 2) on that basis [Norvell] has further argued that, since her employment as a Park Ranger 1 resulted from a promotion from a regular status Lifeguard Supervisor position, Section 804.1 of the Act (71 P.S. § 741.804a) allows for her removal only due to a "just cause;" and 3) accordingly, since hearings based on just cause are conducted under Section 951(a) of the Act, [Norvell] contends that the burden at hearing should have been assigned to the [DCNR, as the] appointing authority.

Comm. Op. at 11–12 (citations omitted). As such, our threshold inquiry in review of Norvell's first issue is directed at ascertaining her status either as a probationary employee, or as a regular status civil employee.

Norvell supports her argument that she was a regular status employee during her tenure as a Lifeguard Supervisor on Section 804.1 of the Act,[4] which reads:

> Rights of promoted employe during probationary period

(a) An employe serving a probationary period which has resulted from a promotion may be removed from the classified service only for just cause.

(b) During the first three months of the probationary period, the employe has the option to return to the position previously held. At any time after the first three months, an employe in probationary status may return to the previous position or classification with written consent of the appointing authorities.

(c) If the employe's performance during the probationary period is not satisfactory to the appointing authority, the employe shall be returned to the position or class held immediately prior to such promotion without necessity of appeal or hearing.

As such, if the burden under the Act was improperly placed upon Norvell instead of the DCNR, the evidence of record may not support her removal for just cause as a regular status Lifeguard Supervisor promoted to probationary status Park Ranger 1 under the Act and its relevant regulations. If Norvell was a probationary status employee at the end of her tenure as a Lifeguard Supervisor, her subsequent hire as a probationary status Park Ranger 1 would not entitle her to a just cause hearing under Section 804.1 of the Act, and the burden would fall to Norvell before the Commission under Section 951(b).

It is undisputed that Norvell seasonally worked, for her entire 17–year tenure as a Lifeguard Supervisor, 3 to 4 months a year, followed by an 8–9 month period of leave. It is also undisputed that Norvell presented no evidence to the Commission that she had ever received any formal written notification of any change in her employment status from probationary to regular, during that tenure. As such, the

---

4. *Added by* the Act of Sept. 29, 1951, P.L. 1636, *as amended*, 71 P.S. § 741.804a.

Commission concluded that Norvell remained a probationary status employee during her entire 17 season tenure based upon two foundations: 1) Pursuant to 4 Pa.Code § 97.32,[5] an appointing authority may require a probationary employee returning from a leave exceeding 30 days to serve a new and full probationary period upon return, and; 2) Section 603(b) of the Act[6] directs that an employee be notified in writing of the attainment of regular status.

Norvell cites to her Employee Performance Evaluation Reports, received during the course of her tenure as a Lifeguard Supervisor, which indicate that her reviewer on those reports checked the "Annual" box, and not the "Probationary" box, at the tops of those forms in the area signifying which type of report was being filed, as documentary evidence of her regular status. *See* C.R. at Appellant's [Norvell's]

Exs. 7, 8, 10. Norvell also cites to two Seasonal Return Worksheets identifying her as a regular status employee. *Id.* at Exs. 6, 20. Norvell further argues that she never received any notification from the DCNR indicating that her repeated annual returns from her leaves of absence were returns to probationary status, or were assumptions of new or renewed probationary periods. Norvell also argues that the DCNR would have notified her of her return as a probationary employee if that was the agency's intent, and cites to evidence of other seasonal employees who enjoyed regular, and not probationary, status. C.R., N.T. of Feb. 25, 2009, at 104, 315–316; N.T. of March 25, 2009, at 61.

Finally on this issue, Norvell asserts that Section 603(a) of the Act[7] limits a probationary period to a maximum of 18 months, and that the relevant regulation[8]

---

5. Section 97.32 of Title 4 of the Pennsylvania Code reads:

   Effects of leaves of absence.
   A probationary employee who returns from a leave of absence shall make up the time lost on the leave by completing the unserved portion of the probationary period. When the leave exceeds 30 consecutive work days, except for military leave, the appointing authority may require that a new, full probationary period be served.

6. 71 P.S. § 741.603(b). Section 603(b) of the Act reads:

   Probationary period
   
         *    *    *
   
   (b) If the employe's work has been satisfactory, the employe shall be notified by the appointing authority in writing prior to the completion of the probationary period that the employe will attain regular status in the classified service upon completion of the probationary period.

7. 71 P.S. § 741.603(a). Section 603(a) of the Act reads, in relevant part:

   Probationary period
   (a) No appointment to a position in the classified service shall be deemed complete until after the expiration of a probationary

period. The probationary period for each class of position shall be prescribed in the rules of the commission and, except for trainee classes, shall in no case be less than six months or more than eighteen months.

8. Section 97.31 of Title 4 of the Pennsylvania Code states, in relevant part:

   Duration and extension of probationary periods.
   (a) The length of the probationary period in appointments and promotions for full-time positions, except for trainee classes, shall be 6 months (defined as 180 calendar days—6 months at 30 days per month). See § 97.37 (relating to trainee classes). Probationary periods for part-time positions shall be prorated according to the number of hours in the work week.
   (b) The probationary period, except for trainee classes, may be extended to a maximum of 18 months (defined as 545 calendar days—365 calendar days plus 6 months at 30 days per month), at the discretion of the appointing authority. If the appointing authority decides to extend an employee's probationary period, it shall notify the employee in writing at least 1 work day prior to the effective date of the extension.

construing that limit requires written notice from the employer to a probationary employee of any probationary period extended beyond the normal 6–month period. Norvell argues that her total time in service as a Lifeguard Supervisor, covering 17 seasons of work, should be accumulated into one probationary period that was satisfied as a default in the absence of any authority to the contrary.

The Commission concluded that the absence within the record of any written notice to Norvell expressly informing her of a change in status from probationary to regular is dispositive to the issue. Additionally, the Commission correctly notes that Norvell is unable to cite to any precedent, statute, or regulation stating that Norvell's annual performance evaluation is sufficient to confer such status upon her.[9] Comm. Op. at 13, n. 5. The Commission further rejected Norvell's implied assumption, which supports all of Norvell's arguments on this issue, that the DCNR had any burden to disprove her asserted status-change-by-default. *Id.* We agree. Our research reveals no authority applicable to the instant facts for the proposition that a change in status from probationary to regular can be effected by the default passage of time in the face of repeated extended leaves of absence for seasonal work, absent express written notification by an appointing authority of such a status change. We decline to find such an excep-

tion to the express mandate of Section 603(b) of the Act requiring such written notice of a status change prior to the completion of a probationary period, where an employee has never completed a 6–month probationary period prior to an extended leave of absence.

Additionally, and independently dispositive of this issue, we agree with the DCNR's reading of the relevant regulations requiring a minimum of 6 months within one calendar year as a prerequisite to completing a probationary period under the unique facts of this case. The DCNR asserts, in consonance with the Commission's conclusion, that reading Sections 97.31 and 97.32 of Title 4 of the Pennsylvania Code *in pari materia* leads to the conclusion that the specific reference to calendar days within Section 97.31 buttresses the conclusion that a probationary period requires a minimum of 6 months in a calendar year to be served before regular status is to be granted, and that the maximum period of 18 months probationary status would implicitly require that the 6–month threshold be reached.

Similarly, we must reject Norvell's assertion that her two satisfactory performance evaluations were sufficient to establish her notification in writing of attaining regular status, as required by Section 603(b) of the Act.[10] The record shows that

4 Pa.Code § 97.31.

9. We note that Norvell has presented no evidence or argument that the personnel responsible for completing either the Performance Evaluation Reports or the Seasonal Return Worksheets—upon which Norvell relies in this argument—is responsible for, or has the authority to, promote an employee from probationary to regular status.

10. The clear applicability of 4 Pa.Code § 97.32 to the facts at bar distinguish this case from our precedents, relied upon by Norvell, in *Wernersville State Hospital* (civil ser-

vice employee did not automatically attain regular status after probationary period without affirmative action by the employer to notify her whether her work was satisfactory), and *Pennsylvania Department of Public Welfare v. State Civil Service Commission*, 707 A.2d 589 (Pa.Cmwlth.1998) (where employee's probation is extended in good faith for purpose of evaluation and not as pretext for some improper purpose, it is within sole discretion of agency to determine whether such extension is necessary and appropriate).

DCNR human resources assistants regularly utilized these evaluations in preparation for bringing back employees from leave without pay. C.R., N.T. of Feb. 25, 2009, at 348–350. Section 603(b) requires, in its own plain language, that "the employe shall be notified by the appointing authority in writing prior to the completion of the probationary period that the employe will attain regular status in the classified service upon completion of the probationary period." 71 P.S. § 741.603(b). An examination of the evaluation forms relied upon by Norvell in this argument— in which a mere box is marked by a human resources assistant purporting to categorize the evaluated employee's service classification—cannot be read as fulfilling the clear mandate of Section 603(b) in relation to the significant event of an employee's change of employment status. Moreover it was well within the DCNR's discretion to place Norvell back on probationary status following her repeated leaves of absences longer than 30 days in duration, pursuant to 4 Pa.Code § 97.32.

■ As such, we defer to the Commission's interpretation of its own regulations regarding the granting of regular status, and regarding the discretion of the DCNR in this matter to place Norvell back on probationary status at the return of each her annual leaves which unquestionably lasted longer than 30 days. Section 603 of the Act, 71 P.S. § 741.603; 4 Pa.Code § 97.32. We have held that "an agency's interpretation of a regulatory statute must be afforded considerable weight and deference by a reviewing court." *Martin Media v. Department of Transportation*, 700 A.2d 563, 566 (Pa.Cmwlth.1997), *petition for allowance of appeal denied*, 555 Pa. 736, 725 A.2d 184 (1998). Nothing in the DCNR's reasoning, or in the Commission's conclusions, can be read to be an unreasonable interpretation of its own regula-

tions under the unique facts of this case. It is well established, under our precedents, that in our appellate role we will defer to an administrative agency's interpretation of its own regulations unless that interpretation is unreasonable. *Department of Environmental Protection v. North American Refractories Co.*, 791 A.2d 461 (Pa.Cmwlth.2002). As such, Norvell's arguments on this issue must fail given the record before us, and the Commission did not err in its assignment of the burden to Norvell pursuant to Section 951(b) of the Act. 71 P.S. § 741.951(b); 4 Pa.Code § 105.16(a).

■ Norvell next argues, in the alternative, that the Commission erred in determining that the DCNR did not discriminate against Norvell in removing her from her position as a Park Ranger 1, due to a mistake of fact. In essence, Norvell argues that the record shows the following mistakes of fact: 1) that Norvell failed to deny her involvement in the accident, according to the testimony of her supervisor, Schall; 2) that Schall indicated to Norvell that she would only receive a reprimand for driving the Dakota out of order, since Norvell's log would show that she was not in the area of the accident; 3) that the investigating State Trooper had been incorrectly informed of the certainty that the Dakota was the particular vehicle involved in the accident prior to the Trooper's commencement of his investigation, upon which information the Trooper relied in drawing his investigatory conclusion, and; 4) that an unnamed witness to the accident in question existed who would corroborate Norvell's, and/or the Dakota's, involvement in the accident, which witness was never produced and upon whose existence Norvell relied in her answers to the inquiries into the accident.

■ However, as the Commission's Opinion clearly details with specific cita-

tions to the record, other evidence exists contradicting each of the four asserted mistakes of fact presented by Norvell. *See* Comm. Op. at 14–33. As such, Norvell's argument on this issue amounts to a request for this Court to reweigh the evidence presented, and/or to revisit the credibility determinations made by the Commission.[11] It is axiomatic that the Commission is the sole fact finder in civil service cases, and has exclusive authority to assess witness credibility and resolve evidentiary conflicts. *Pennsylvania Board of Probation and Parole v. State Civil Service Commission*, 4 A.3d 1106 (Pa.Cmwlth.2010). As such, we will not disturb the Commission's credibility determinations or reweigh the conflicting evidence presented, and Norvell's arguments on this issue are without merit.

Accordingly, we affirm.

## ORDER

AND NOW, this 20th day of January, 2011, the order of the State Civil Service Commission, dated August 28, 2009, at Appeal No. 25855, is affirmed.

11. We note that Norvell has not challenged the substantiality of the record evidence supporting any of the Commission's Findings. Notwithstanding, our review of the record as a whole reveals substantial evidence supporting all of the Findings made in this matter.